2012-1269

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SCHAEFFLER GROUP USA, INC.

Plaintiff-Appellant,

v.

UNITED STATES and
UNITED STATES CUSTOMS AND BORDER PROTECTION,

Defendants-Appellees,

and

UNITED STATES INTERNATIONAL TRADE COMMISSION,

Defendant-Appellee,

and

THE TIMKEN COMPANY and MPB CORPORATION,

Defendants-Appellees.

---

Appeal from the United States Court of International Trade in
consolidated case no. 06-CV-0432, Judge Gregory W. Carman.

---

### RESPONSE BRIEF OF THE TIMKEN COMPANY AND MPB CORPORATION

Terence P. Stewart
Geert De Prest
Patrick J. McDonough
STEWART AND STEWART
2100 M Street, NW, Suite 200
Washington, DC 20037
(202) 785-4185
tstewart@stewartlaw.com

*Special Counsel to the Timken
Company and MPB Corporation,
Defendants-Appellees*

November 3, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*Schaeffler Group*          v.          *US*

No. **2012-1269**

# CERTIFICATE OF INTEREST

Counsel for the defendants-appellees **The Timken Company and MPB Corporation** certifies the following:

1.      The full name of every party or amicus represented by me is:

*The Timken Company and MPB Corporation*

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

*Not applicable.*

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

*The Timken Company has no parent company.  No publicly held company owns 10% or more of The Timken Company.   MPB Corporation is 100% owned by The Timken Company.*

4. ☐     There is no such corporation as listed in paragraph 3.

5.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

*Stewart and Stewart: Terence P. Stewart, Geert De Prest (partners); Amy S. Dwyer, Patrick J. McDonough (of counsel); J. Daniel Stirk (associate)*

| | |
|---|---|
| **November 3, 2014** | */s/ Terence P. Stewart* |
| Date | Signature of counsel |
| | **Terence P. Stewart** |
| | Printed name of counsel |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................ 1

STATEMENT OF THE ISSUE ................................................................... 2

STATEMENT OF THE CASE ................................................................... 2

STATEMENT OF THE FACTS ................................................................. 3

SUMMARY OF THE ARGUMENT ........................................................... 9

ARGUMENT .......................................................................................... 13

I.   Standard of Review ........................................................................ 13

II.  The Application Of The CDSOA's Petition-Support Requirement To
     Preexisting Antidumping Duty Orders To Determine Eligibility For
     Benefits Does Not Violate The Due Process Clause Of The Fifth
     Amendment. ................................................................................. 16

     A.   Schaeffler Fails To Establish That It Has A Protected Interest
          Implicating Due Process ........................................................ 17

     B.   The Retroactive Application Of The CDSOA's Petition-Support
          Requirement Is Constitutional Because It Is Supported By A
          Legitimate Legislative Purpose. ............................................ 24

          1.   The retroactive application of the CDSOA's petition-support
               requirement is justified by a rational legislative purpose. ................. 24

          2.   Schaeffler's arguments are unavailing. ............................................. 36

     C.   Schaeffler's Reliance On *Landgraf* Is Inapposite. .................................. 44

CONCLUSION ...................................................................................... 52

# TABLE OF AUTHORITIES

## CASES

*American Mfrs. Mut. Ins. Co.* v. *Sullivan,* 526 U.S. 40 (1999) .................................. 17

*Ashley Furniture Indus., Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013) ....................................................................................... 5, 6

*Ashley Furniture Industries, Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *cert. denied*, 574 U.S. ___ (U.S. Oct. 6, 2014) (No. 13-1367) .............................................................................................. 6

*Ashley Furniture Industries, Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3677 (U.S. May 2, 2014) (No. 13-1367) ............................................................................ 6

*Ass'n of Bituminous Contractors v. Apfel,* 156 F.3d 1246 (D.C. Cir. 1998) ......................................................................................... 42

*Association of Accredited Cosmetology Schools* v. *Alexander,* 979 F.2d 859 (D.C. Cir. 1992) ............................................................. 20

*Board of Regents v. Roth,* 408 U.S. 564 (1972) ........................................... 17, 20

*Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624 (Fed. Cir. 2012) ......................... 14, 28

*Candle Corp. of America v. U.S. Int'l Trade Comm'n,* 374 F.3d 1087 (Fed. Cir. 2004) ................................................................. 14

*Central States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 999 F. Supp. 1153 (N.D. Ill. 1998), *aff'd*, 181 F.3d 799 (7th Cir. 1999) ....................................................................................... 23, 43

*Commonwealth Edison Co.* v. *United States,* 271 F.3d 1327 (Fed. Cir. 2001) (en banc) ................................................................. passim

*Cox* v. *Hart,* 260 U.S. 427 (1922) .................................................................. 49

*Davon, Inc. v. Shalala,* 75 F.3d 1114 (7th Cir. 1996) ........................ 25, 40, 42, 43

*Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353 (Fed. Cir. 2006) ....................................................................................... 14

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978) ........................................................................................ 19

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ...................................... 42, 43

*Falek v. Gonzales*, 475 F.3d 285 (5th Cir. 2007) ............................................. 47

# TABLE OF AUTHORITIES

*First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279 (Fed. Cir. 1999)..................................................................13

*General Auto Service Station v. City of Chicago*, 526 F.3d 991 (7th Cir. 2008).......................................................................................18

*General Motors Corp. v. Romein*, 503 U.S. 181 (1992)...........................43, 47, 48

*Gould Inc. v. A & M Battery & Tire Serv.*, 232 F.3d 162 (3d Cir. 2000) ..........................................................................................25

*Guangdong Wireking Housewares & Hardware v. United States*, 745 F.3d 1194 (Fed. Cir. 2014) ............................................................14

*Hamama v. INS*, 78 F.3d 233 (6th Cir. 1996)......................................................47

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369 (Fed. Cir. 2003) .............................................................................. 21, 41

*Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207 (10th Cir. 2000) ..........................................................................................17

*Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009)..............................................41

*In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir. 1995)................................... 42, 43

*Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1 (7th Cir. 1974)........................................................................................18

*Koyo Corporation of U.S.A. v. United States*, 899 F. Supp. 2d 1367 (Ct. Int'l Trade 2013), *appeal docketed*, No. 13-1399 (Fed. Cir. May 14, 2013) ............................................................................. 26, 33

*Landgraf* v. *USI Film Products*, 511 U.S. 244 (1994) ...................................passim

*Lieberman-Sack v. HCHP-NE*, 882 F. Supp. 249 (D.R.I. 1995)..........................39

*Lyng* v. *Payne,* 476 U.S. 926 (1986) ...................................................................21

*Madrid v. Gomez*, 940 F. Supp. 247 (N.D. Cal. 1996).........................................50

*Martin v. Hadix,* 527 U.S. 343 (1999) .................................................................19

*McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13 (1st Cir. 1993) ................49

*Mohammed v. Ashcroft*, 261 F.3d 1244 (11th Cir. 2001) ....................................47

*Mojica v. Reno*, 970 F. Supp. 130 (E.D.N.Y. 1997) ............................................37

*Monoson v. United States,* 516 F.3d 163 (3d Cir. 2008) ....................................19

*N.Y. Cent. R.R. Co. v. White,* 243 U.S. 188 (1917)..............................................20

# TABLE OF AUTHORITIES

*NationsBank of Texas, NA. v. United States*, 269 F.3d 1332 (Fed. Cir. 2001) ...................................................................................... 14

*New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474 (7th Cir. 1990) ................................................................................ 17

*New Hampshire Ball Bearing, Inc. v. United States*, 815 F. Supp. 2d 1301 (Ct. Int'l Trade 2012), *aff'd*, 563 Fed. App'x 779 (Fed. Cir. 2014) ......................................................................................... 26, 31, 33

*New Valley Corp. v. United States,* 119 F.3d 1576 (Fed. Cir. 1997) .................... 13

*NSK Corp. v. United States*, 821 F. Supp. 2d 1349 (Ct. Int'l Trade 2012) ........................................................................................ 26, 33

*Pat Huval Rest. & Oyster Bar, Inc. v. U.S. Int'l Trade Comm'n*, 823 F. Supp. 2d 1365 (Ct. Int'l Trade 2012) .................................... 26, 33

*Patlex Corp. v. Mossinghoff*, 758 F.2d 594 (Fed. Cir. 1985) ............................ 22, 23

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717 (1984) ................................................................................ passim

*Princess Cruises, Inc. v. United States*, 201 F.3d 1352 (Fed. Cir. 2000) ...................................................................................... 14

*Princess Cruises, Inc. v. United States*, 397 F.3d 1358 (Fed. Cir. 2005) ...................................................................................... 48

*PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 409 F. App'x 327 (Fed. Cir. 2010) .................................................................................. 5

*PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 684 F.3d 1374 (Fed. Cir. 2012) .................................................................................. 5

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ........................................ 45

*Schaeffler Group USA, Inc. v. United States*, 808 F. Supp. 2d 1358 (Ct. Int'l Trade 2012) ................................................................... passim

*SKF USA Inc. v. United States,* 451 F. Supp. 2d 1355 (Ct. Int'l Trade 2006) .................................................................................. 3

*SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009) .......................................................................... passim

*SKF USA, Inc. v. U.S. Customs & Border Protection*, 583 F.3d 1340 (Fed. Cir. 2009) .................................................................................. 4

iv

# TABLE OF AUTHORITIES

*SKF USA, Inc. v. United States Customs & Border Protection,* 130 S.Ct. 3273 (May 17, 2010) ...................................................................5

*Templeton Coal Co. v. Shalala,* 882 F. Supp. 799 (S.D. Ind. 1995), *aff'd,* 75 F.3d 1114 (7th Cir. 1996) ..............................................................24

*Town of Castle Rock v. Gonzales,* 545 U.S. 748 (2005)......................20

*Travenol Labs., Inc. v. United States,* 118 F.3d 749 (Fed. Cir. 1997) ..................49

*United States v. Carlton,* 512 U.S. 26 (1994)..................... 19, 27, 28, 43

*United Synthetics, Inc. v. United States,* 844 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) ................................................................. 26, 33

*Usery v. Turner Elkhorn,* 428 U.S. 1(1976)...............................passim

*Wheeler v. United States,* 768 F.2d 1333 (Fed. Cir. 1985) ..................16

*Zorzi v. County of Putnam,* 30 F.3d 885 (7th Cir.1994) ......................18

## STATUTES

5 U.S.C. § 706 ........................................................................................14

5 U.S.C. § 706(2)(A)..............................................................................14

19 U.S.C. § 1675c ..................................................................................21

19 U.S.C. § 1675c (note)................................................................. 43, 49

19 U.S.C. § 1675c(b)(1) ................................................................. 20, 41

19 U.S.C. § 1675c(b)(1)(A)....................................................................40

19 U.S.C. § 1675c(d)(1) .........................................................................26

28 U.S.C. § 1581(i).................................................................................14

28 U.S.C. § 2640(e) ................................................................................14

Continued Dumping and Subsidy Offset Act of 2000, Pub.L. No. 106–387, § 1001–1003, 114 Stat. 1549, 1549A–72–75 (codified at 19 U.S.C. § 1675c (2000)) ........................................................................2

Deficit Reduction Act of 2005, Pub.L. 109–171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective October 1, 2007).................................2

# TABLE OF AUTHORITIES

## ADMINISTRATIVE AUTHORITIES

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Final) and Inv. Nos. 731 -TA-391-399 (Final), USITC Pub. 2185 (May 1989) ................................8

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Preliminary) and Inv. Nos. 731 -TA-391-399 (Preliminary), USITC Pub. 2083 (May 1988) ................................................................................8

## RULES

Federal Circuit Rule 47.5(a) ................................................................1

Federal Circuit Rule 47.5(b) ................................................................1

# STATEMENT OF RELATED CASES

**Federal Circuit Rule 47.5(a):**

**Whether any other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court?**

No.

**Federal Circuit Rule 47.5(b):**

**The title and number of any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal. If there are many related cases, they may be described generally, but the title and case number must be given for any case known to be pending in the Supreme Court, this court, or any other circuit court of appeals.**

We are aware of two cases pending before the United States Court of Appeals for the Federal Circuit that may be affected by the Court's disposition of this appeal.

- *Pat Huval Restaurant & Oyster Bar, Inc. v. U.S. International Trade Commission,* Appeal Nos. 2012-1250, -1347.
- *JTEKT North America Corporation v. United States,* Appeal No. 2012-1399 (stayed pending the mandate in *Pat Huval v. USITC*, 12-1250, -1347).

We are aware of two cases before the United States Court of International Trade that may be affected by the Court's disposition of this appeal.

- *Barden Corporation v. United States*, Consol. Court No. 06-00435.
- *JTEKT North America Corporation v. United States,* Court No. 14-00127 (stayed pending final resolution of *Pat Huval v. USITC*, 12-1250, -1347).

1

## STATEMENT OF THE ISSUE

Whether the application of the petition-support requirement of the Continued Dumping and Subsidy Offset Act of 2000 to preexisting antidumping duty orders to determine eligibility for benefits is constitutionally permissible and not violative of the Due Process Clause of the Fifth Amendment to the United States Constitution because such application is supported by a rational legislative purpose.

## STATEMENT OF THE CASE

This appeal concerns whether the application of the petition-support requirement of the Continued Dumping and Subsidy Offset Act of 2000[1] ("CDSOA") to preexisting antidumping duty orders to determine eligibility for benefits is constitutional under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

Plaintiff-appellant, Schaeffler Group USA, Inc. ("Schaeffler") appeals the final judgment of the United States Court of International Trade ("Trade Court") holding that the CDSOA's petition-support requirement is constitutional and that "Congress did not violate Schaeffler's Fifth Amendment due process rights in

---

[1]    Continued Dumping and Subsidy Offset Act of 2000, Pub.L. No. 106–387, § 1001–1003, 114 Stat. 1549, 1549A–72–75 (codified at 19 U.S.C. § 1675c (2000)), repealed by Deficit Reduction Act of 2005, Pub.L. 109–171, § 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective October 1, 2007); *see* **Exhibit 1**.

basing potential eligibility for CDSOA disbursements on a decision on whether to support the petition that Schaeffler made prior to the enactment of the CDSOA." *Schaeffler Group USA, Inc. v. United States*, 808 F. Supp. 2d 1358, 1363 (Ct. Int'l Trade 2012) ("Schaeffler") (JA27, JA31).

## STATEMENT OF THE FACTS

Schaeffler sets out background facts regarding the underlying antidumping ("AD") investigations, the statute, and administrative actions. *See* Schaeffler Brief at 4-9. We provide the following additional background facts.

This appeal is another in a long list of cases before this Court that concerned the constitutionality of the CDSOA. All prior appeals have affirmed the constitutionality of the CDSOA. The initial decision of this Court on the issue of the CDSOA's constitutionality was *SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009) ("SKF"). In that case, at the Trade Court, SKF USA, Inc. ("SKF") fully briefed and argued claims that the CDSOA's petition-support requirement violated the First Amendment, the Due Process Clause of the Fifth Amendment, and the Equal Protection component of the Fifth Amendment to the U.S. Constitution. *See SKF USA Inc. v. United States,* 451 F. Supp. 2d 1355, 1356 (Ct. Int'l Trade 2006) ("SKF specifically challenges the constitutionality of the CDSOA on First Amendment, Due Process and Equal Protection grounds."). In its decision, the Trade Court held that the CDSOA

3

violated the Equal Protection guarantees of the U.S. Constitution. *SKF USA,* 451 F. Supp. 2d at 1363. In the ensuing appeal to this Court, SKF defended the Trade Court's judgment that the CDSOA violated the Equal Protection guarantees of the U.S. Constitution. But, as an alternative (indeed, SKF's primary) basis for affirming the Trade Court, SKF argued that the CDSOA violated the free speech guarantees of the First Amendment of the U.S. Constitution. *See SKF*, 556 F.3d at 1349 ("SKF urges its First Amendment theory as its primary ground for affirming the Court of International Trade's judgment."). SKF, however, chose not to argue to this Court that the Trade Court's judgment should also be affirmed on the alternative ground that the retroactive application of the CDSOA violated the Due Process guarantees of the U.S. Constitution, even though, as with its First Amendment claim, SKF had fully litigated its Due Process claim before the Trade Court.

This Court reversed the Trade Court's judgment and expressly held that the CDSOA did not violate either the First Amendment or Equal Protection guarantees of the Fifth Amendment to the U.S. Constitution. *SKF,* 556 F.3d at 1360. Subsequently, this Court denied a request for rehearing and rehearing en banc. *SKF USA, Inc. v. U.S. Customs & Border Protection*, 583 F.3d 1340 (Fed. Cir. 2009). The U.S. Supreme Court thereafter denied a petition for writ of certiorari.

*See SKF USA, Inc. v. United States Customs* & *Border Protection,* 130 S.Ct. 3273 (May 17, 2010).

Later, because this Court held that its decision in *SKF* was "controlling" on the First Amendment constitutional issues presented in the PS Chez Sidney appeal, this Court summarily reversed the Trade Court's judgment that the CDSOA violated the First Amendment. *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 409 F. App'x 327, 329 (Fed. Cir. 2010). In the same case, this Court also reaffirmed that "the constitutionality of the Byrd Amendment . . . was decided in *SKF*." *PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 684 F.3d 1374, 1379 n.3 (Fed. Cir. 2012) (citing *SKF,* 556 F.3d at 1360).

This Court again addressed the constitutionality of the CDSOA in the appeals of Ashley Furniture and Ethan Allen Global where this Court reaffirmed its holding in *SKF* that the CDSOA was constitutional under the First Amendment, confirmed that the "plain language of the statute requires 'support of the petition' in order to obtain a distribution," and confirmed that "a producer who never indicates support for the petition by letter or through questionnaire response cannot be an ADP [affected domestic producer]." *Ashley Furniture Indus., Inc. v. United States*, 734 F.3d 1306, 1311 (Fed. Cir. 2013) ("Ashley") (deciding both the *Ashley* and *Ethan Allen* appeals). The Court held that its decision was "consistent with both *SKF* and *Chez Sidney*." *Id.* This Court denied rehearing and rehearing en

banc on January 3, 2014. On May 2, 2014, Ashley and Ethan Allen filed a Petition for a writ of certiorari at the U.S. Supreme Court. *See Ashley Furniture Industries, Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3677 (U.S. May 2, 2014) (No. 13-1367). On October 6, 2014, the U.S. Supreme Court denied Ashley's and Ethan Allen's petition for certiorari. *See Ashley Furniture Industries, Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013), *cert. denied*, 574 U.S. ___ (U.S. Oct. 6, 2014) (No. 13-1367).

The *Ashley-Ethan Allen* decision also rejected the argument that intervening Supreme Court decisions issued subsequent to *SKF* had implicitly overturned *SKF* by undermining this Court's First Amendment analysis and changing the requisite level of scrutiny appropriate for the CDSOA. *See Ashley,* 734 F.3d at 1310.

In *SKF*, the Court noted that SKF had actively opposed the antifriction bearings ("AFB") petitions by, among other things, opposing the petition in its questionnaire responses, testifying in opposition at both the preliminary conference and final hearing held by the International Trade Commission, and filing opposing briefs. *See SKF,* 556 F.3d at 1343, 1358-59. Schaeffler took exactly the same actions in opposing the antifriction bearings petition.

It is undisputed that Schaeffler is "the legal successor to two U.S. producers of antifriction bearings who participated in" the ITC's 1988 bearings investigation -- INA Bearing Co., Inc. ("INA") and FAG Bearings Corp. ("FAG"). *See*

*Schaeffler*, 808 F. Supp. 2d at 1359-60 & n.3 (JA28).  Also, in its brief, Schaeffler states: "Through its predecessor corporate entities  INA USA Corporation and FAG Bearings Corporation, Schaeffler actively participated in the investigation and opposed the petition with regard to all countries."  Schaeffler Brief at 5, citing the INA and FAG questionnaire responses (JA32-JA39).

The Trade Court recognized that the "facts as pled place Schaeffler on the same footing as other potential claimants who did not support the petition, such as SKF."  *Schaeffler*, 808 F. Supp. 2d. at 1362 (JA30) (citing and quoting *SKF,* 556 F.3d at 1343: "Since it was a domestic producer, SKF also responded to the ITC's questionnaire, but stated that it opposed the antidumping petition.").  Indeed, Schaeffler is on all fours with SKF in terms of its active opposition to the bearings petition.  In particular, like SKF:

- INA and FAG were U.S. subsidiaries of major foreign bearing producers named in the petition and found to have been a source of dumped bearings in the original  investigation;

- INA opposed the petition in a letter following its preliminary  response, and then again in its final questionnaire response[2]; FAG opposed the petition in both its preliminary  and final questionnaire responses; [3]

---

[2]    *See* excerpt from Final INA Questionnaire Response dated Feb. 7, 1989 (JA36-37).  In its preliminary  questionnaire response dated Apr. 14, 1988, INA indicated it did not wish to take a position (*see* JA32-33), but on April 22, 1988, one week after its preliminary  response and one day after the ITC's preliminary  conference, INA's counsel filed a letter with the ITC stating: "INA Bearing Company, Inc., … has concluded that it <u>must oppose</u> the Antidumping

- INA and FAG appeared at the ITC preliminary conference opposing antidumping relief;[4]

- INA and FAG filed pre-hearing and post-hearing briefs opposing relief at the ITC final-stage investigation;[5] and

- INA and FAG appeared at the ITC hearing opposing antidumping relief.[6]

---

Petition ….” Emphasis added. INA continued to oppose the petition thereafter throughout the ITC's preliminary and final investigations.

[3]  *See* excerpt from Preliminary FAG Questionnaire Response dated Apr. 19, 1988 (JA34-35); and excerpt from Final FAG Questionnaire Response dated Feb. 8, 1989 (JA38-39).

[4]  *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Preliminary) and Inv. Nos. 731 -TA-391-399 (Preliminary), USITC Pub. 2083 (May 1988) at B-21 (listing counsel for “INA Bearing Co., Inc.” as appearing at the ITC conference “in opposition to the imposition of countervailing and antidumping duties”) and B-22 (listing counsel for “FAG Bearings Corporation” as appearing at the ITC conference “in opposition to the imposition of countervailing and antidumping duties”).

[5]  *See, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, Inv. Nos. 303-TA-19 and 20 (Final) and Inv. Nos. 731 -TA-391-399 (Final), USITC Pub. 2185 (May 1989) at 16 n.16 (JA65), 20 n.27 (JA69), A-15 n.1 (JA111a) (referencing pre-hearing and post-hearing briefs of FAG Bearings Corporation and INA Bearing Company, Inc. filed jointly with their respective foreign parents and other foreign operations).

[6]  *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan Romania, Singapore, Sweden, Thailand, and the United Kingdom*, ITC Hearing transcript, March 30, 1989, at 4-5 (listing appearances of counsel for INA and FAG at the ITC hearing “in opposition to the imposition of antidumping and countervailing duties”), 171-174 (testimony of FAG in opposition to the petition), and 175-178 (testimony of INA in opposition to the petition).

Thus, there is no question that Schaeffler was in active opposition to the petition in the same manner as was SKF, and that, for all relevant CDSOA purposes, Schaeffler is in a position identical to that of SKF.

## SUMMARY OF THE ARGUMENT

Schaeffler has no valid legal claim. The retroactive application of the CDSOA's petition-support requirement does not violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

### **Schaeffler fails to establish a protected interest implicating Due Process.**

The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty. Before Schaeffler may assert a due process argument — procedural or substantive — it must establish that it has a legitimate claim of entitlement to the right being asserted. Schaeffler fails to identify any protected interest in property or liberty of which it has been deprived by virtue of the CDSOA's petition-support requirement. While Schaeffler asserts that it relied on existing legal rules when it opposed the petitions, its reliance and unilateral expectations do not amount to property interests implicating substantive due process. Even assuming *arguendo* that Schaeffler had a reliance interest in the antidumping law status quo, the CDSOA did not affect that interest because the

9

CDSOA did not substantively change the antidumping law. The lack of a protected property interest is fatal to Schaeffler's due process claim.

### The retroactive application of the CDSOA's petition-support requirement is supported by a legitimate legislative purpose.

The test of due process in assessing economic legislation is rationality, and the same rationality standard applies to both prospective and retroactive aspects of legislation. Schaeffler must show that Congress acted in an arbitrary and irrational way in enacting the retroactive aspects of the CDSOA's petition-support requirement. Schaeffler fails to do so.

Congress expressly prescribed that the CDSOA covers all antidumping orders in effect on January 1, 1999. This retroactive aspect of the CDSOA, however, does not offend due process. Retroactive statutes are not prohibited by the Due Process Clause. The retroactive application of a statute satisfies constitutional due process concerns simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose. The CDSOA's petition-support requirement easily passes this constitutional test.

This Court has held that Congress had a substantial interest in enforcing the trade laws and that the CDSOA serves the rational legislative purpose of rewarding parties who assist the government's enforcement of the antidumping law. This interest and purpose rationally apply equally to antidumping orders in existence

10

when CDSOA was enacted and to petitions filed after enactment. Schaeffler wrongly asserts that the CDSOA's legislative purpose was to "incentivize" litigation support activities. Rewarding and incentivizing are not the same things. This Court has held that the legislative purpose of the CDSOA was to <u>reward</u>, not incentivize.

Given the statute's purpose to <u>reward</u>, it would have made little sense for Congress to reward only domestic producers who supported future petitions but to deny the same reward to domestic producers who had supported petitions that resulted in orders already in existence when the CDSOA was enacted. Thus, Congress reasonably concluded that, where antidumping orders have been issued but dumping still continues, the statute's purpose of rewarding initiators and supporters of trade law enforcement should apply equally to existing orders as well as to future orders. By doing so, Congress gave comprehensive scope to the statute's salutary purpose which would be more fully effectuated by rewarding all of those domestic producers who assisted the government's trade law enforcement whether or not the CDSOA was in place when they provided that assistance and support. This is an eminently rational justification supporting the retroactive application of the petition-support requirement.

## Schaeffler's arguments are unavailing.

Schaeffler fails its burden to show that the retroactive application of the CDSOA's petition-support requirement is irrational. Schaeffler claims that the CDSOA was unforeseen and upset its settled expectations. But, unforeseeability of changes to law and settled expectations are not sound bases for finding a due process violation. Schaeffler claims it is irrational to reward pre-CDSOA orders because the legislative purpose was to incentivize litigation support activities. Schaeffler misstates the legislative purpose. The CDSOA's legislative purpose recognized by this Court was to reward producers for initiating or supporting successful trade proceedings, not to incentivize litigation support. Schaeffler argues that the CDSOA is a "means of retribution" against companies opposing petitions because the CDSOA's successor provisions deny distributions to opposing companies forever. Not only is Schaeffler not challenging the acquisition provision, but this Court has repeatedly found that the CDSOA is not a penal law. Schaeffler argues that the CDSOA's retroactive effect offends Due Process because of its severity, *i.e.*, the extent of its temporal reach. But, the length of time that a retroactive statute reaches back is not determinative of a due process violation.

12

**Schaeffler's reliance on *Landgraf* is inapposite.**

Schaeffler claims that the CDSOA violates due process because the statute has impermissible retroactive effects, citing *Landgraf* v. *USI Film Products*, 511 U.S. 244, 266 (1994). But the factors identified in that case for determining whether to construe a statute as retroactive say nothing about, and are inapposite to, the test for invalidating legislation under the Due Process Clause. *Landgraf* did not even purport to address that issue. Thus, Schaeffler's reliance on *Landgraf* is wholly misplaced.

## ARGUMENT

### I.  STANDARD OF REVIEW

This Court reviews the dismissal of an action for failure to state a claim upon which relief may be granted without deference. *See First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1286-87 (Fed. Cir. 1999). "In so doing, [this Court] also 'assume[s] that all well-pled factual assertions are true and make[s] all reasonable inferences in favor of' [the plaintiff] … to the extent that such allegations are relevant to the constitutional issues." *Commonwealth Edison C*o. v. *United States,* 271 F.3d 1327, 1338 (Fed. Cir. 2001) (en banc), quoting *New Valley Corp. v. United States,* 119 F.3d 1576, 1580 (Fed. Cir. 1997).

In cases arising under 28 U.S.C. § 1581(i), the Court applies the standard of review provided in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 2640(e). This Court "will set aside Customs' denial of offset distributions only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1354 (Fed. Cir. 2006), quoting *Candle Corp. of America v. U.S. Int'l Trade Comm'n*, 374 F.3d 1087, 1091 (Fed. Cir. 2004), citing 5 U.S.C. § 706(2)(A).

The APA also provides that the Court "shall … interpret constitutional and statutory provisions …." 5 U.S.C. § 706. "The determination of the constitutionality of a statute is a question of law, which this court reviews without deference." *NationsBank of Texas, NA. v. United States,* 269 F.3d 1332, 1335 (Fed. Cir. 2001). Thus, the Court reviews the Trade Court's determination of the constitutionality of a statute *de novo. See Guangdong Wireking Housewares & Hardware v. United States*, 745 F.3d 1194, 1200 (Fed. Cir. 2014); *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 628 (Fed. Cir. 2012); *Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1357 (Fed. Cir. 2000).

Where a statute is challenged as violating the Due Process Clause based on retroactivity, "[t]he standard of review … is well-settled." *Commonwealth Edison,* 271 F.3d at 1341.

14

> As the Supreme Court stated in [*Usery v.*] *Turner Elkhorn,* 428 U.S. [1], at 15, 96 S.Ct. 2882 [(1976)], "[i]t is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." So too the Supreme Court observed in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984):
>
>> Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.
>
> *Id.* at 729, 104 S.Ct. 2709 (citing *Turner Elkhorn,* 428 U.S. at 15-16, 96 S.Ct. 2882). Where the basis for the challenge is retroactivity, the Supreme Court has held that Due Process is satisfied "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* at 730, 96 S.Ct. 2882.

*Commonwealth Edison,* 271 F.3d at 1341. In such Due Process cases, "the federal courts are not assigned the task of making policy, determining a fair outcome, or determining the actual state of facts." *Commonwealth Edison,* 271 F.3d at 1342. Rather, they "are charged simply with determining whether the congressional action was rational" and "[u]nder that rational purpose standard it will be a rare circumstance where federal legislation that is retroactive will be held

15

unconstitutional under the Due Process Clause." *Commonwealth Edison,* 271 F.3d at 1342. Accordingly, because "[t]he presumption of constitutionality is extremely difficult to overcome," *Wheeler v. United States,* 768 F.2d 1333, 1337 (Fed. Cir. 1985), "such Due Process challenges will only succeed in the rarest of cases." *Commonwealth Edison,* 271 F.3d at 1345.

## II. THE APPLICATION OF THE CDSOA'S PETITION-SUPPORT REQUIREMENT TO PREEXISTING ANTIDUMPING DUTY ORDERS TO DETERMINE ELIGIBILITY FOR BENEFITS DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT.

Schaeffler claims that the CDSOA's petition-support requirement, as applied to Schaeffler, is impermissibly retroactive in violation of due process. This claim fails at every step. Schaeffler's due process claim lacks merit because application of the CDSOA to Schaeffler did not impair any protected property interest or involve any cognizable retroactivity. Moreover, even assuming that applying the petition-support requirement of the CDSOA retroactively to Schaeffler affects a protected property interest implicating the Due Process Clause, Schaeffler's argument still fails. The retroactive application of the CDSOA's petition-support requirement readily satisfies the governing rationality standard for constitutionality.

The Trade Court dismissed Schaeffler's retroactive Due Process claim for failure to state a claim upon which relief could be granted. *See Schaeffler,* 808 F.

Supp. 2d at 1363-64 (JA31).  Because Schaeffler again fails to show that its due

process claim has any validity, this Court should affirm the Trade Court's

dismissal.

### A.    Schaeffler Fails To Establish That It Has A Protected Interest Implicating Due Process.

The Due Process Clause of the Fifth Amendment states that "[n]o person

shall be … deprived of life, liberty, or property, without due process of law."  "The

first inquiry in every due process challenge is whether the plaintiff has been deprived of

a protected interest in 'property' or 'liberty.'"  *American Mfrs. Mut. Ins. Co.* v. *Sullivan*,

526 U.S. 40, 59 (1999).  Only after finding a deprivation of a protected interest is it

relevant whether the statute comports with due process.

"Before a party may assert a due process argument — procedural or

substantive — it must establish that it has a 'legitimate claim of entitlement' to the

right being asserted."  *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910

F.2d 1474, 1479 (7th Cir. 1990) (quoting *Board of Regents v. Roth,* 408 U.S. 564,

577 (1972)); *see also Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207,

1210 (10th Cir. 2000) ("[T]o prevail on either a procedural or substantive due

process claim, a plaintiff must first establish that a defendant's actions deprived

plaintiff of a protectible property interest.").  In other words, "[i]ntrusion upon a

cognizable property interest is a threshold prerequisite to a substantive due process

claim." *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1002 (7th

Cir. 2008). "Consequently, the lack of a protected property interest is fatal to a

substantive due process claim." *General Auto,* 526 F.3d at 1002, citing *Zorzi v.*

*County of Putnam,* 30 F.3d 885, 894 (7th Cir.1994); *see also Jeffries v. Turkey Run*

*Consolidated School District,* 492 F.2d 1, 4 (7th Cir. 1974) ("Accordingly, the

absence of any claim by the plaintiff that an interest in liberty or property has been

impaired is a fatal defect in her substantive due process argument.").

Schaeffler fails to identify any protected interest in property or liberty of

which it has been deprived by virtue of the CDSOA's petition-support

requirement. Thus, the lack of a protected property interest is fatal to its due

process claim.

The most that Schaeffler contends is that it "relied upon the then-existing

legal rules when it decided to 'check the box' and oppose the AFBs antidumping

petition." Schaeffler Brief at 14. Schaeffler further states that, when it opposed

the petition, "it did so based on a reasonable reliance that its position would be

used only in the ITC's injury analysis, and not to competitively burden the

company." Schaeffler Brief at 20. Schaeffler claims that it "had settled

expectations based on current law and practice that its conduct in opposing the

petition alone would not result in financial benefit to its competitors or competitive

18

harm to itself."[7] *Id.* Schaeffler claims that its reliance and expectations "were

upended by the retroactive application of the CDSOA." *Id.* Schaeffler is wrong –

its reliance and unilateral expectations do not amount to property interests

implicating substantive due process.

Before the CDSOA's enactment, Schaeffler had no vested rights under

existing antidumping law, or settled expectations in static trade laws. No one,

including Schaeffler, has a vested right in the hope that a law will not change.

That principle is well-established. The Supreme Court has said: "Our cases have

clearly established that '[a] person has no property, no vested interest, in any rule

of the common law.'" *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438

U.S. 59, 88 n.32 (1978) (citation omitted). With respect to tax law, the Supreme

Court has said that "[t]ax legislation is not a promise, and a taxpayer has no vested

right in the Internal Revenue Code." *United States v. Carlton,* 512 U.S. 26, 33

(1994). Thus, "[n]o person has a vested interest in any rule of law, entitling him to

---

[7]   Schaeffler cites *Martin v. Hadix,* 527 U.S. 343, 360 (1999) and *Monoson v. United States,* 516 F.3d 163, 168 n.2 (3d Cir. 2008) in support of its argument that it "had settled expectations based on current law and practice that its conduct in opposing the petition alone would not result in financial benefit to its competitors or competitive harm to itself." *See* Schaeffler Brief at 20. Neither of those cases concerns Due Process or any constitutional issues. Rather, both of those cases examine whether a statute should be construed as retroactive by applying factors outlined by the Supreme Court in *Landgraf*, 511 U.S. at 270. *See Martin,* 527 U.S. at 352-53, 358-59; *Monoson*, 516 F.3d at 167.

insist that it shall remain unchanged for his benefit." *N.Y. Cent. R.R. Co. v. White,* 243 U.S. 188, 198 (1917).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756 (2005), quoting *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Before the CDSOA's enactment in 2000, Schaeffler did not have any claim of entitlement to CDSOA distributions because such distributions had never existed before. After the CDSOA's enactment, Schaeffler could not claim that it had been deprived of any interest in any vested right, because the statute did not give Schaeffler any claim of entitlement to CDSOA distributions. *See* 19 U.S.C. § 1675c(b)(1) (Schaeffler does not meet the definition of "affected domestic producer"). Thus, Schaeffler had no "vested rights" in future eligibility to CDSOA distributions. *See Town of Castle Rock,* 545 U.S. at 756 (abstract desire for or unilateral expectation of a benefit does not establish a property interest); s*ee also Association of Accredited Cosmetology Schools* v. *Alexander,* 979 F.2d 859, 864 (D.C. Cir. 1992) (plaintiffs had no "vested rights" to future eligibility to participate in government program, and any expectation to future eligibility does not constitute a vested interest). The Supreme Court has said: "We have never held that applicants for benefits, as distinct from those already

receiving them, have a legitimate claim of entitlement protected by the Due Process Clause of the Fifth or Fourteenth Amendment." *Lyng* v. *Payne,* 476 U.S. 926, 942 (1986).

Moreover, even assuming *arguendo* that Schaeffler had some vested interest in its reliance on, and expectations of, antidumping law status quo, which it does not, the CDSOA did not affect that interest because the CDSOA did not substantively change the antidumping law. Schaeffler wrongly asserts that the CDSOA wrought a significant change to the antidumping law. Schaeffler Brief at 16-18. It did not. While this Court found that the CDSOA "enhance[d]" the "remedial nature" of the antidumping law, *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1380 (Fed. Cir. 2003), the CDSOA did not change how dumping margins were calculated or impose additional liability on parties like Schaeffler if it was found to be dumping in administrative reviews. *See* 19 U.S.C. § 1675c (no changes made to antidumping margins calculations or antidumping liability). For instance, the CDSOA did not affect how dumping is determined— the dumping calculus was unchanged by passage of the CDSOA. *See Huaiyin*, 322 F.3d at 1380 ("the antidumping duties assessed under the current collection regime are identical to those assessed prior to implementation of the Byrd Amendment"). The CDSOA left the antidumping law exactly the same in terms of commencement of cases, facts examined, methodology used to determine dumping, considerations

21

of whether an industry was materially injured, the conduct of administrative

reviews, and the amount of dumping found (or not). Nor did the CDSOA cause

any domestic producer to lose any preexisting remedy. Instead, all that Congress

did in enacting the CDSOA was to address the problem of continued dumping or

subsidization after antidumping or countervailing duty orders are imposed by

rewarding, through distribution of assessed AD and CVD duties, those domestic

producers who aided the government's enforcement of the trade laws by

petitioning for or supporting successful AD and CVD proceedings.

Schaeffler also claims that the CDSOA frustrated and invalidated its

"investment-backed expectations." *See* Schaeffler Brief at 20-22. That claim is

meritless.[8] Schaeffler's predecessor companies in the United States (INA Bearing Co.,

---

[8] Schaeffler argues that "economic impact" and the "frustration of reasonable, investment-backed expectations" are factors to be considered "in a Fifth Amendment analysis." Schaeffler Brief at 20-21, purportedly quoting from *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 23-24 (1976). Schaeffler, however, miscites *Turner Elkhorn.* In fact, these quotes come from *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 602 (Fed. Cir. 1985), *reh'g granted in part & denied in part*, 771 F.2d 480 (Fed. Cir. 1985), a case that Schaeffler otherwise cites at page 25 of its brief on an entirely different point.

In any event, Schaeffler's cite is not germane. The CDSOA is very different from the context of *Patlex*. In that case, Congress had enacted a law providing that any person may request reexamination of a patent, a statute which by its express terms was retrospective. As this Court explained, the plaintiffs were patent owners who had a protectible property interest in their patents, and "[t]he encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude" others. *Patlex*, 758 F.2d at 599. Here, Schaeffler

Inc. and FAG Bearings Corp.) were long-time affiliates of foreign producers (now merged into the Schaeffler Group) who were charged in the AFB petition with dumping, who actively opposed the petition and investigation, and who were determined to have engaged in dumping. Schaeffler's "expectations" appear to have been that, despite the imposition of AD orders, its foreign parent would continue to dump, it (as importer) would continue to pay dumping duties, and the U.S. producers who had petitioned for relief or supported the petition would continue to be competitively disadvantaged thereby. Although Schaeffler does not detail what, if any, past investments it made on these extraordinary expectations, which the CDSOA purportedly disturbed, these expectations hardly constitute protected interests. Indeed, as the courts have recognized, "[i]t is well settled that 'whether or to what extent a particular piece of legislation dashes a parties' economic 'expectations' generally poses no constitutional impediment since all economic legislation—whether labeled prospective or retroactive—inherently disrupts someone's financial expectations.'" *Central States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 999 F. Supp. 1153, 1165 (N.D. Ill. 1998), *aff'd*, 181 F.3d 799 (7th Cir. 1999), quoting

has no protected interest in its alleged investment-backed expectations. Although this Court recognized in *Patlex* that the frustration of reasonable, investment-backed expectations in the patent context was a factor to be considered, the Court ultimately determined that the statute did not violate due process because the statute had legitimate purposes and "Congress did not act in an arbitrary and irrational way to achieve its desired purposes." *Id*. at 603.

*Templeton Coal Co. v. Shalala*, 882 F. Supp. 799, 814 (S.D. Ind. 1995), *aff'd*, 75 F.3d 1114 (7th Cir. 1996).

In summary, Schaeffler fails to identify the due process "threshold prerequisite" of a protected interest, much less demonstrate that the CDSOA deprives it of any protected interest that implicates the Due Process Clause. Accordingly, because Schaeffler's due process claim lacks the necessary predicate of a protected interest, it should be rejected.

**B.    The Retroactive Application Of The CDSOA's Petition-Support Requirement Is Constitutional Because It Is Supported By A Legitimate Legislative Purpose.**

   1.   *The retroactive application of the CDSOA's petition-support requirement is justified by a rational legislative purpose.*

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.
>                              ***
> The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, ….

*Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 17 (1976). Thus, the Supreme Court has "stated that both the retroactive and the prospective aspects [of legislation] are subject to the test of due process. The test of due process in

24

assessing economic legislation is rationality." *Davon, Inc. v. Shalala*, 75 F.3d 1114, 1123 (7th Cir. 1996). The same rationality standard applies to both prospective and retroactive aspects of legislation.

In order to prove that the CDSOA, a statute "adjusting the burdens and benefits of economic life," violates substantive due process, Schaeffler must show that Congress "acted in an arbitrary and irrational way" by enacting the legislation. In applying this rational-basis standard, the CDSOA "need only be justifiable on some rational basis"; "it is not necessary that Congress have actually articulated a particular rational basis." *Gould Inc. v. A & M Battery & Tire Serv.*, 232 F.3d 162, 170 (3d Cir. 2000). Thus, Schaeffler must show that Congress had no conceivable rational legislative purpose in enacting the retroactive aspects of the CDSOA, whether or not Congress itself articulated a rational purpose. Schaeffler fails to do so.

Schaeffler asserts that the retroactive application of the CDSOA's petition-support requirement has "no rational basis" (Schaeffler Brief at 9) and "is not rationally related to a legitimate government purpose" (*id.* at 23), but Schaeffler fails to support this claim – because it cannot. Even assuming *arguendo* that Schaeffler has a protected interest affected by application of the CDSOA's petition-support requirement, Schaeffler's due process argument still must fail. Where the basis for a constitutional challenge to legislation is retroactivity, the

Supreme Court has held that Due Process is satisfied "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984). The CDSOA's petition-support requirement easily passes this constitutional test.

Congress expressly prescribed that the temporal reach of the CDSOA extends to antidumping orders in effect on January 1, 1999. *See* 19 U.S.C. § 1675c(d)(1) (applying to "orders or findings in effect on January 1, 1999, or thereafter"). In that respect, the CDSOA's petition-support requirement may be assumed to have retroactive application.[9] But, that fact itself does not offend due process. Retroactive statutes are not prohibited by the Due Process Clause.

---

[9] The Trade Court observed that "CDSOA's petition support requirement has *a retroactive aspect* in that it conditions the receipt of distributions on support decisions including support decisions that were made before the statute was passed." *New Hampshire Ball Bearing, Inc. v. United States*, 815 F. Supp. 2d 1301, 1307 (Ct. Int'l Trade 2012) (emphasis added), *aff'd*, 563 Fed. App'x 779 (Fed. Cir. 2014) (summary affirmance). The Trade Court followed its *New Hampshire Ball Bearing* decision in *Schaeffler*, 808 F. Supp. 2d at 1363-64 (JA31).

The Trade Court made similar observations in the following decisions: *NSK Corp. v. United States*, 821 F. Supp. 2d 1349, 1357-58 (Ct. Int'l Trade 2012); *Pat Huval Rest. & Oyster Bar, Inc. v. U.S. Int'l Trade Comm'n*, 823 F. Supp. 2d 1365, 1377 (Ct. Int'l Trade 2012); *United Synthetics, Inc. v. United States*, 844 F. Supp. 2d 1310, 1321-23 (Ct. Int'l Trade 2012); *Koyo Corporation of U.S.A. v. United States*, 899 F. Supp. 2d 1367, 1372 (Ct. Int'l Trade 2013), *appeal docketed*, No. 13-1399 (Fed. Cir. May 14, 2013).

Indeed, "the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively." *Pension Benefit*, 467 U.S. at 729.

Where Congress has prescribed that a statute applies retroactively, as it did in the CDSOA, the only basis for challenging its retroactive application is a constitutional one. The Supreme Court has noted that, absent a constitutional violation (*i.e.*, Ex Post Facto Clause, Takings Clause, Bill of Attainder, and Due Process Clause), "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." *Landgraf*, 511 U.S. at 267.

As noted, the Supreme Court has held that the retroactive application of a statute satisfies constitutional due process concerns "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit*, 467 U.S. at 730. So also, this Court has said:

> [R]etroactive legislation, …, "must meet the test of due process." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Id.* at 729, 104 S.Ct. 2709; *see also United States v. Carlton,* 512 U.S. 26, 30-31, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994). This "'burden is met simply by showing that the

27

> retroactive application of the legislation is itself justified
> by a rational legislative purpose.'" *Carlton,* 512 U.S. at
> 31, 114 S.Ct. 2018 (quoting *Pension Benefit,* 467 U.S. at
> 729-30, 104 S.Ct. 2709 (1984)).

*Brooks,* 702 F.3d at 628.

The CDSOA's petition-support requirement easily meets the test of a rational legislative purpose supporting a retroactive application. Schaeffler acknowledges that this Court has held that "the purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings." *See* Schaeffler Brief at 13, quoting *SKF,* 556 F.3d at 1352. But, Schaeffler fails to explain why the rational legislative purpose of the CDSOA which this Court identified in *SKF* does not also suffice to uphold the retroactive application of the CDSOA's petition-support requirement against a Due Process challenge.

In *SKF*, this Court held that Congress had a substantial interest in enforcing the trade laws and that the CDSOA serves the rational legislative purpose of rewarding parties who assist the government's enforcement of the antidumping law. *SKF*, 556 F.3d at 1355, 1360. In *SKF*, this Court specifically considered whether the CDSOA's petition-support requirement, in the context of retroactive

application to SKF, was constitutional under the First Amendment and the Equal

Protection Clause. This Court held that it was:

> In summary, the Byrd Amendment is within the
> constitutional power of Congress to enact, furthers the
> government's substantial interest in enforcing the trade
> laws, and is not overly broad. We hold that the Byrd
> Amendment is valid under the First Amendment.
>
> Because it serves a substantial government
> interest, the Byrd Amendment is also clearly not violative
> of equal protection under the rational basis standard.

*SKF*, 556 F.3d at 1360.

With respect to the CDSOA's legislative purpose, this Court held:

> The purpose of the Byrd Amendment's limitation of
> eligible recipients was to <u>reward</u> injured parties who
> assisted government enforcement of the antidumping
> laws by initiating or supporting antidumping
> proceedings.

*SKF*, 556 F.3d at 1352 (emphasis added).

> [P]reventing dumping is a substantial government
> interest.

*Id.* at 1355.

> [The CDSOA] directly advances the government's
> substantial interest in trade law enforcement by
> <u>rewarding</u> parties who assist in this enforcement. The
> government has a substantial interest in <u>rewarding</u> those
> who assist in the enforcement of government policy.

*Id.* (emphasis added).

29

> It was thus rational for Congress to conclude that those who did not support the petition should not be <u>rewarded</u>.

*Id.* at 1359 (emphasis added).

> [The CDSOA] is rationally related to the government's legitimate purpose of <u>rewarding</u> parties who promote the government's policy against dumping.

*Id.* at 1360 (emphasis added).

This same combination of interests and purposes supporting the CDSOA's petition-support requirement would rationally apply either to antidumping orders in existence at the time of the CDSOA's enactment or to petitions filed after the CDSOA's enactment. Congress reasonably concluded that, where antidumping orders have been issued but dumping still continues, the statute's purpose of rewarding initiators and supporters of trade law enforcement should apply equally to existing orders as well as to future orders. By doing so, Congress gave comprehensive scope to the statute's salutary purpose of rewarding those producers who had assisted the government's trade law enforcement.

It was not irrational for Congress to thus conclude that the legislative interests and purposes of the CDSOA identified by this Court in *SKF* would be more fully effectuated by applying the CDSOA's petition-support requirement to the roughly 350 antidumping and countervailing duty orders in effect on January 1,

1999, rather than only to orders issued after the CDSOA was enacted.  The Trade

Court reached this very conclusion:

> We reasoned that "it would not be arbitrary or irrational
> for Congress to conclude that the legislative purpose of
> rewarding domestic producers who supported
> antidumping petitions ... would be 'more fully
> effectuated' if the petition support requirement were
> applied both prospectively and retroactively."

*Schaeffler*, 808 F. Supp. 2d at 1363 (JA31), quoting *New Hampshire Ball Bearing,*

815 F. Supp. 2d at 1309 (quoting *Pension Benefit,* 467 U.S. at 730-31).

The Supreme Court has recognized that retroactive application of statutes

"often serve entirely benign and legitimate purposes," including the purpose of

giving "comprehensive effect to a new law Congress considers salutary."

*Landgraf*, 511 U.S. at 267-68.  *See also Pension Benefit*, 467 U.S. at 730 ("it was

eminently rational for Congress to conclude that the purposes of the MPPAA could

be more fully effectuated if its withdrawal liability provisions were applied

retroactively").  The retroactive application of the CDSOA's petition-support

requirement fits precisely this "benign and legitimate" mold by giving

"comprehensive effect" to a "salutary" statute.

In *Schaeffler*, the Trade Court held that the retroactive application of the

CDSOA's petition-support requirement did not violate Due Process guarantees

because it was justified by a rational legislative purpose. *See Schaeffler*, 808 F.

31

Supp. 2d at 1363-64 (JA31).  In *Schaeffler*, the Trade Court cited to and relied

upon its earlier decision in *New Hampshire Ball Bearing,* where it held:

> The Court of Appeals previously concluded that "the
> purpose of the Byrd Amendment's limitation of eligible
> recipients was to reward injured parties who assisted
> government enforcement of the antidumping laws by
> initiating or supporting antidumping proceedings," *SKF
> USA II,* 556 F.3d at 1352, and that "the Byrd Amendment
> is rationally related to the government's legitimate
> purpose of rewarding parties who promote the
> government's policy against dumping," *id.* at 1360. * * *
> Because Plaintiff specifically attacks the CDSOA on due
> process retroactivity grounds, we consider whether "the
> retroactive application of the legislation is itself justified
> by a rational legislative purpose." *Pension Benefit,* 467
> U.S. at 730, 104 S.Ct. 2709.  We conclude that it is.
>
> It was not arbitrary or irrational for Congress to
> conclude that the legislative purpose of rewarding
> domestic producers who supported antidumping
> petitions, *i.e.,* the very legislative purpose the Court of
> Appeals recognized, would be "more fully effectuated" if
> the petition support requirement were applied both
> prospectively and retroactively.  *See Pension Benefit,* 467
> U.S. at 730-31, 104 S.Ct. 2709.  By doing so, Congress
> provided monetary rewards, in the form of reimbursed
> expenses, not only to domestic producers expressing
> support for petitions in future antidumping investigations
> but also to those domestic producers who supported past
> antidumping petitions that ripened into antidumping duty
> orders and who continue to produce goods competing
> with imported merchandise subject to those orders.  By
> applying the CDSOA to the approximately 350
> antidumping and countervailing duty orders in effect
> before CDSOA enactment, rather than only to those
> orders issued afterwards, Congress provided a reward

mechanism that was considerably more comprehensive than one based only on a prospective scheme. * * *

The court concludes that the retroactive reach of the petition support requirement in the CDSOA is justified by a rational legislative purpose and therefore is not vulnerable to attack on constitutional due process grounds.

*New Hampshire Ball Bearing,* 815 F. Supp. 2d at 1309.[10]

This Court has determined that the legislative purpose of the CDSOA was to reward parties that assist the government's enforcement of the antidumping law. That purpose is comprehensively and most effectually served by rewarding all of those domestic producers who assisted government enforcement of the antidumping law through litigation support activities (*i.e.*, petitioning or supporting a petition and investigation), whether or not the CDSOA was in place when they provided that assistance and support. By applying the CDSOA to all existing orders, regardless of when they were issued, Congress determined to reward, on an equal basis, all domestic companies that (1) assisted the government in enforcing the antidumping law by supporting a petition that resulted in an order, and (2) "continued" to be subject to the injurious impact of dumping in spite of the

---

[10] The Trade Court reached similar determinations in the following decisions: *NSK Corp.*, 821 F. Supp. 2d at 1357-58; *Pat Huval*, 823 F. Supp. 2d at 1377; *United Synthetics,* 844 F. Supp. 2d at 1321-23; *Koyo Corp of U.S.A.,* 899 F. Supp. 2d at 1372.

imposition of the existing antidumping duty order. This is an eminently rational justification for retroactively applying the petition-support requirement of the CDSOA to all existing pre-enactment orders (as well as prospectively to post-enactment orders). And, this justification is wholly consistent with the purpose of the CDSOA discerned by this Court in *SKF*—to reward only "parties who assisted government enforcement of the antidumping laws by initiating or supporting antidumping proceedings." *SKF*, 556 F.3d at 1352.

Schaeffler correctly notes that "the purpose of the petition support requirement was to reward parties that assisted government enforcement of the trade laws." Schaeffler Brief at 25. But then, Schaeffler, incorrectly and critically, misstates the purpose when it asserts in the very next sentence that the "legislative purpose" was "<u>incentivizing</u> litigation support activities that aid enforcement of the trade laws," which Schaeffler claims only relates to post-enactment orders. *Id.* (emphasis added). Rewarding and incentivizing are not the same things. For example, if an organization creates a new "lifetime achievement award" and presents it to someone who had no reason to believe such an award would ever exist, it has rewarded that person without ever having incentivized that person (and rationally so). A "reward" is a form of recompense for past action, while an "incentive" is something meant to stimulate future action. A desire to reward is

entirely legitimate and rational, and has a different scope than a desire to incentivize.

Schaeffler focuses on the wrong purpose. The legislative purpose of the CDSOA recognized by this Court was to <u>reward</u>, not incentivize. As such, that purpose is served by rewarding those who assisted government enforcement of the antidumping law, and supported a petition and investigation, whether or not the CDSOA was in place when they provided that assistance and support. This purpose has nothing to do with incentives, and all to do with rewarding conduct that supported enforcement of the antidumping law.

Indeed, if the statute's purpose is to <u>reward</u>, there is no reason for Congress to provide a reward only to domestic producers who support future petitions but to deny the same reward to domestic producers who supported petitions resulting in orders already in existence when the CDSOA was enacted. The reward is operative only where dumping continues after an order is issued; it is not a benefit that flows automatically from an antidumping duty order. Hence, even for preexisting AD orders, if dumping continued after CDSOA enactment, it was reasonable for Congress to determine that those domestic producers who supported petitions related to those preexisting orders should also be rewarded for supporting successful petitions and enforcement of the trade laws.

It was hardly arbitrary for Congress to reward all supporters of successful petitions – whether relating to existing orders or to future orders. Indeed, it would have been odd for Congress to reward one group but deny the other, and it would have been strange for Congress to so discriminate when the purpose of the statute is to reward support for the government's enforcement of the trade laws. And, as the Trade Court found, it was reasonable for Congress to believe that the remedial function of the statute would be more fully effectuated if it applied to all assessments made after the CDSOA was enacted, regardless of when the order was issued.

In sum, because the legitimate legislative purpose of the CDSOA found in *SKF* equally supports both pre-enactment and post-enactment antidumping orders, this purpose satisfies the Due Process test for retroactive application of legislation. Accordingly, the Court should find that the retroactive application of the CDSOA's petition-support requirement does not violate the Due Process Clause.

### 2. *Schaeffler's arguments are unavailing.*

Schaeffler offers a number of reasons why the retroactive application of the CDSOA's petition-support requirement is irrational. However, all of these arguments are unavailing.

Schaeffler argues that the retroactive application of the statute is irrational because it upset its settled expectations and does not serve the legislative purpose.

Schaeffler states that, given the retroactive application of the CDSOA, a court must consider whether Schaeffler "could have anticipated the potential liability attached to its chosen conduct and avoided the liability by altering its conduct." Schaeffler Brief at 23.[11]  Schaeffler further claims that the "government does not have a rational basis for determining eligibility for CDSOA disbursements today based on speech and conduct that occurred … prior to the enactment of the CDSOA" (Schaeffler Brief at 23) because it will not further the "legislative purpose – *i.e.*, incentivizing litigation support activities that aid enforcement of the trade laws" which is "only rationally related to post-enactment orders where domestic producers had notice of the CDSOA's provisions" (Schaeffler Brief at 25) (emphasis added).  Schaeffler claims that, given the statute's "goal of motivating compliance with governmental policy" (Schaeffler Brief at 25), this "incentivizing" purpose is furthered only if domestic parties have "prior notice" (*i.e.*, their settled expectations are not disturbed) of possible CDSOA distributions (Schaeffler Brief at 24).

---

[11]  In support of this assertion, Schaeffler cites *Mojica v. Reno*, 970 F. Supp. 130, 170 (E.D.N.Y. 1997).  *Mojica*, however, concerned a statute that, unlike the CDSOA, did not have clear instructions regarding its retroactive reach.  *See Mojica,* 970 F. Supp. at 168 ("With [the statute], Congress expressed no clear intent favoring retroactivity ….").

These arguments are unconvincing. First, Schaeffler's use of the term "liability" is incorrect. The CDSOA did not impose a retroactive liability on Schaeffler, it simply provided for a potential reward to domestic producers who supported successful antidumping and countervailing duty petitions. Schaeffler also misstates the legislative purpose. As reviewed above, the legislative purpose of the CDSOA recognized by this Court was to <u>reward</u> domestic producers for initiating or supporting successful trade proceedings, <u>not to incentivize</u> litigation support or to motivate compliance with trade laws. A "reward" is equally applicable to past as well as to future conduct, while an incentive only looks forward to future conduct.

As to the possible upsetting of settled expectations[12] by the CDSOA, and the unforeseeability and lack of notice of changes to the law, none of these arguments provide a sound basis for finding a due process violation. See, for example:

---

[12] In arguing that the CDSOA affected their settled expectations and reliance on existing legal rules, Schaeffler asserts that, had it "imagined" the CDSOA's "altering of the law, … it very likely may have had no choice but to express support for the antidumping petition." Schaeffler Brief at 14. This assertion is improbable. Schaeffler fails to point out any example since the CDSOA's enactment of a domestic producer, owned by a foreign producer alleged to be dumping, that supported a petition. Indeed, as this Court pointed out in *SKF*, the interests of a domestic producer allied with a foreign-producer dumper is in defeating the petition, not in supporting the petition and hoping that it will receive CDSOA distributions when dumping continues. *See SKF*, 556 F.3d at 1358 ("Opposing parties' interests lie in defeating the petition, typically (as is

> The core of defendants' argument is that the legislation is
> <u>unconstitutional because it changed their expectations</u>
> about the extent of their liability in this case. However,
> <u>this reason alone is an insufficient basis to strike down</u>
> <u>the law as unconstitutional</u>. Indeed, defendants'
> argument is framed in precisely the terms adumbrated by
> the Supreme Court when it held that "readjusting rights
> and burdens is not unlawful solely because it upsets
> otherwise settled expectations." *Pension Benefit*
> *Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729,
> 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (citations
> omitted). Defendants are bound to show that the 1992
> Amendment to FEPA lacked a legitimate legislative
> purpose, but the only one they offer is that it disturbed
> their expectations. <u>Such an argument fails to</u>
> <u>demonstrate unconstitutionality under *Pension Benefit*</u>
> <u>*Guaranty.*</u>

*Lieberman-Sack v. HCHP-NE*, 882 F. Supp. 249, 255 (D.R.I. 1995) (emphasis

added).[13]

> [P]laintiffs cite no authority indicating that foreseeability
> is a due process requirement for retroactive legislation;
> thus we have searched only for a rational basis. In the

---

the case here) because the domestic industry participant is owned by a foreign
company charged with dumping.").

[13]  Of note, the court found that the statute at issue (an amendment to the Rhode
Island Fair Employment Practices Act ("FEPA")) was "not unconstitutionally
retroactive" because it had a "legitimate purpose." *Lieberman-Sack,* 882 F.
Supp. at 255, 256. Moreover, the court said that the argument regarding the
constitutionality of the FEPA was "weakened" because the FEPA amendment
pertained to damages, not to liability, and that "when a legislature effects a
retroactive change in the law of damages and not in the law of liability, due
process concerns are not as compelling." *Id. ,* 882 F. Supp. at 256. Like the
amendment to FEPA, the CDSOA did not pertain to liability; it merely
provided a benefit, and, as such, due process concerns are weakened.

> same vein is plaintiffs' argument that the Coal Act upsets their settled expectations and therefore offends due process. Even assuming the statute upset their expectations, the Supreme Court has said that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations," and "[t]his is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Turner Elkhorn,* 428 U.S. at 15-16, 96 S.Ct. at 2892-2893.

*Davon,* 75 F.3d at 1127.

> Plaintiffs further argue that lack of timely notice of impending liability under the Coal Act violates due process. This is nothing more than their unforeseeability and settled-expectations arguments combined. They offer no authority, and we have uncovered none, that timely notice is a due process requirement for retroactive economic legislation.

*Davon,* 75 F.3d at 1127 n. 10.

Schaeffler also argues that the CDSOA is a "means of retribution" against companies that oppose petitions because the CDSOA's "successor provisions deny any and all CDSOA disbursements, *ad infinitum*, to any company that supported a petition if it is later acquired by a company that opposed a petition, and to the acquiring company that opposed the petition." Schaeffler Brief at 26. Initially, we note that the due process issue raised in Schaeffler's appeal concerns the retroactive application of the petition-support requirement of the CDSOA (19 U.S.C. § 1675c(b)(1)(A)), not the acquisition provision of the CDSOA (19 U.S.C.

40

§ 1675c(b)(1)).  In any event, Schaeffler's "means of retribution" argument is

without merit.  While courts have noted that the possibility of retribution may be a

concern in retroactive statutes, that concern is resolved by the legislature's clear

intent.

> The strongest protection that federal courts give to those
> concerns [*e.g.*, retribution], however, is a requirement
> that Congress manifest the retroactive nature of
> legislation with "clear intent." *Id.* [*Landgraf,* 511 U.S.]
> at 272, 114 S.Ct. 1483.  "[A] requirement that Congress
> first make its intention clear helps ensure that Congress
> itself has determined that the benefits of retroactivity
> outweigh the potential for disruption or unfairness." *Id.*
> at 268, 114 S.Ct. 1483; *see also id.* at 272-73, 114 S.Ct.
> 1483 ("Requiring clear intent assures that Congress itself
> has affirmatively considered the potential unfairness of
> retroactive application and determined that it is an
> acceptable price to pay for the countervailing benefits.").
> "Such a requirement allocates to Congress responsibility
> for fundamental policy judgments concerning the proper
> temporal reach of statutes, and has the additional virtue
> of giving legislators a predictable background rule
> against which to legislate." *Id.* at 273, 114 S.Ct. 1483.

*Ileto v. Glock, Inc.*, 565 F.3d 1126, 1138 (9th Cir. 2009).  Moreover, this Court has

repeatedly rejected the argument that the CDSOA is penal.  *See Huaiyin,* 322 F.3d

at 1380; *see also SKF,* 556 F.3d at 1350, n.21, 1351-52.

Finally, Schaeffler argues that "the retroactive effect of the CDSOA is

equally offensive to the Due Process Clause because of its severity," by which it

means the length of the statute's temporal reach (*i.e.*, Schaeffler's eligibility is

"based on speech occurring 12 years prior to enactment").  Schaeffler Brief at 27.

This argument lacks merit.

Schaeffler cites *Eastern Enterprises v. Apfel*, 524 U.S. 498, 549 (1998)

(plurality opinion) in support of its argument.  *See* Schaeffler Brief at 27 (and 19).

The value of *Eastern Enterprises* as due process precedent is doubtful because that

case was decided by a divided court and the plurality decided the case on the basis

of the Takings Clause, not the Due Process Clause.  This Court has noted of

*Eastern Enterprises*:

> The District of Columbia Circuit has concluded that the
> plurality and concurrence in *Eastern Enterprises* cannot
> be combined into a single holding on the Due Process
> issue. *Ass'n of Bituminous Contractors v. Apfel,* 156
> F.3d 1246, 1254-55 (D.C. Cir. 1998) ("Justice Kennedy's
> concurrence in the judgment is of no help in appellant's
> efforts to cobble together a due process holding from
> *Eastern Enterprises*' fragmented parts.... Justice
> Kennedy's due process reasoning can in no sense be
> thought a logical subset of the plurality's takings
> analysis.").

*Commonwealth Edison*, 271 F.3d at 1343 n.14.

The length of time that a retroactive statute reaches back is not determinative

of a due process violation.  The Seventh Circuit has noted that "there is no support

for the proposition that the degree of retroactivity itself violates the Due Process

Clause."  *Davon,* 75 F.3d at 1126, citing *In re Chateaugay Corp.*, 53 F.3d 478, 491

(2d Cir. 1995).  The *Chateaugay* court said: "The proposition that the Due Process

42

Clause imposes a time limit on a law's retrospective effect elicits no support from the case law." 53 F.3d at 491. Thus, "Congress can make a statute retroactive for as long a period as is rational." *Davon,* 75 F.3d at 1126. Schaeffler fails to show that the degree of retroactivity applied here by the CDSOA is irrational.[14] Indeed, given that the statute directed that, for any order in existence as of January 1, 1999, CDSOA distributions would only be derived from duties assessed on or after October 1, 2000 (*see* 19 U.S.C. § 1675c (note)), the degree of retroactivity with respect to distributions is minimal, and certainly not irrational.

In sum, Schaeffler has not met its burden to establish a due process violation – it fails to show that, in enacting the retroactive reach of the CDSOA's petition-support requirement, Congress acted in an arbitrary and irrational way. Hence, Schaeffler's due process claim must be rejected.

---

[14] Indeed, Schaeffler fails to show why a 12-year period of retroactivity during which time dumping continued, is "unreasonable", or is in any way comparable to the rare example of the 30-50 year "severe retroactive liability" at issue in *Eastern Enterprises* (524 U.S. at 528). Compare *General Motors Corp. v. Romein*, 503 U.S. 181, 191-92 (1992) (6-year period of retroactivity does not violate due process); *Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.,* 999 F. Supp. 1153, 1165 (N.D. Ill. 1998) (16-22 year period of retroactivity does not violate due process).

Schaeffler also quotes Justice O'Connor's concurrence in *Carlton,* 512 U.S. at 38 stating that a period of retroactivity of more than a year would raise constitutional concerns. *See* Schaeffler Brief at 12 and 19. However, that case, concerning retroactive tax legislation, is not at all like the CDSOA, which does not impose a retroactive tax liability but rather provides a reward to domestic producers for supporting the government's trade law enforcement.

## C.     Schaeffler's Reliance On *Landgraf* Is Inapposite.

Schaeffler's due process argument fails to distinguish between precedents that address whether a statute should be construed to have retroactive effect (a statutory challenge) and precedents that address whether a statute's retroactive application is constitutionally impermissible.[15]  Thus, Schaeffler confuses the standards for reviewing a constitutional claim against retroactive legislation with the standards applicable to a statutory claim against retroactivity.

---

[15]  In addition, Schaeffler relies, over and over again, on the very same arguments that underlie the failed First Amendment challenges of itself and others who have preceded it.  For example:

> Schaeffler could not have anticipated … that the government would fundamentally alter the companies' <u>speech rights</u> ….

Schaeffler Brief at 13 (emphasis added).

> The government does not have a rational basis for determining eligibility for CDSOA disbursements today based on <u>speech</u> and conduct that occurred many years ago. Rewarding <u>speech</u> and conduct that occurred prior to the enactment of the CDSOA will not further the governmental purposes of preventing dumping or enforcing the trade laws.

Schaeffler Brief at 23-24 (emphasis added).

> In the case of Schaeffler, the CDSOA and Defendants' application thereof are denying a benefit based on <u>speech</u> occurring 12 years prior to enactment.

Schaeffler Brief at 27 (emphasis added).  But, those issues were decided by this Court in *SKF*.  By repeatedly resurrecting these issues, Schaeffler shows that its Due Process challenge is simply a repackaged version of its and others' failed First Amendment arguments.

Schaeffler, at length, attempts to demonstrate that the CDSOA is a statute that has an "impermissible retroactive effect." *See* Schaeffler Brief at 10-22. In support of this effort, Schaeffler cites *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). *See, e.g.,* Schaeffler Brief at 11-12, 16, 20.[16] Yet, *Landgraf* is a case that has nothing whatsoever to do with the test for invalidating legislation under the Due Process Clause. *Landgraf* concerned whether the instructions of a new statute, in the absence of express direction in the statute regarding its temporal reach, should be given effect with regard to events that preceded the enactment of the statute.[17] *Landgraf* did not even remotely address whether a statute was

---

[16] Schaeffler also invokes *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) (*see* Schaeffler Brief at 13-14), but that case likewise concerns discerning Congress's retroactive intent from statutory interpretation rather than the constitutional test for impermissibly retroactive legislation.

[17] In the words of the Supreme Court:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf*, 511 U.S. at 280.

45

constitutionally defective because it was impermissibly retroactive in its reach.

Hence, *Landgraf* and its factors are not a guide to whether a retroactively applied

statute violates constitutional due process.

Other courts have recognized that *Landgraf*, although not infrequently cited

in support of a due process argument, is irrelevant to that purpose. For example,

the Eleventh Circuit explained:

> Mohammed contends that applying the amended
> definition of aggravated felony to a conviction that pre-
> dates IIRIRA's effective date, thereby making him
> ineligible to seek discretionary relief from removal,
> violates his rights under the Due Process Clause of the
> Fifth Amendment. In making this argument, Mohammed
> relies extensively on the Supreme Court's opinion in
> *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct.
> 1483, 128 L.Ed.2d 229 (1994). <u>Technically speaking,
> however, *Landgraf* does not purport to lay down rules for
> deciding when retroactive application of a statute would
> violate Due Process</u>. Rather, the Supreme Court in that
> case established principles to be used by courts in
> evaluating whether, as a matter of statutory analysis, an
> Act of Congress may be applied retroactively. Although
> the Court did discuss potential Due Process
> considerations as one reason to adhere to the general
> presumption against a statute's retroactivity in the
> absence of clear Congressional intent to the contrary, *see
> id.* at 266, 114 S.Ct. at 1497, the Court did not attempt to
> define precisely when retroactive application of a statute
> would violate Due Process. *** *Landgraf,* therefore,
> does not fully address the constitutional objection raised
> by Mohammed.

*Mohammed v. Ashcroft*, 261 F.3d 1244, 1248-49 (11th Cir. 2001) (citation omitted) (emphasis added). In the same vein, the Fifth Circuit said:

> Although there is language in the Supreme Court's seminal decision in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), indicating that retroactive application of the law can implicate legitimate due process concerns, constitutional due process was not the ground relied upon by the court in that case ….

*Falek v. Gonzales*, 475 F.3d 285, 290 (5th Cir. 2007). *See also Hamama v. INS*, 78 F.3d 233, 236 (6th Cir. 1996) ("*Landgraf* involved statutory interpretation, not constitutional scrutiny").

Although Schaeffler's due process argument largely relies on *Landgraf* factors (which go to determining whether an ambiguous statute has retroactive effects, not to whether an unambiguous retroactive statute is constitutionally permissible), Schaeffler is challenging the CDSOA on constitutional, not statutory, grounds—it asserts that the retroactive application of the CDSOA's petition-support requirement violates the due process guarantees of the Fifth Amendment. Schaeffler appears to be trying to reinvent the constitutional test or trying to prove points that are not disputed. For example, Schaeffler insists that "the Constitution demonstrate[s] that laws with retroactive effect should be viewed with caution." Schaeffler Brief at 11. Schaeffler also quotes *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992), for the point that retroactive legislation can present

problems of unfairness. *See* Schaeffler Brief at 12. But that decision also explained that, for purposes of a Due Process challenge, all that is required to sustain legislation against a claim of impermissible retroactivity is "a legitimate legislative purpose furthered by rational means." *Romein*, 503 U.S. at 191, citing *Pension Benefit Guar. Corp.*, 467 U.S. at 730.

Schaeffler asserts that a court must examine three factors to determine whether a statute is retroactive: (1) the "nature and extent of the change of the law"; (2) "the degree of connection between the operation of the new rule and a relevant past event"; and (3) "considerations of fair notice, reasonable reliance, and settled expectations." *See* Schaeffler Brief at 16, citing *Landgraf*, 511 U.S. at 270, and *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1362-63 (Fed. Cir. 2005). [18] Schaeffler claims that, under these factors, the CDSOA "has a

---

[18] In *Princess Cruises,* this Court considered the *Landgraf* factors to answer non-constitutional questions about whether Customs had authority to impose certain tax liability regarding prior conduct. *Landgraf* concerned whether a statute should be read to apply to certain cases arising before its enactment. Neither *Princess Cruises* nor *Landgraf* involved a constitutional attack on a statute.

considerable retroactive effect" (Schaeffler Brief at 22) and "created impermissible effects on Schaeffler" (*id.* at 16).[19]

---

[19]  Even if the *Landgraf* factors were relevant to the constitutional question presented here, which they are not, the CDSOA does not have a "retroactive effect" in the sense in which that term is defined by *Landgraf. See Landgraf*, 511 U.S. at 280 ("retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed").

The CDSOA did not affect Schaeffler by imposing any new legal consequences or liabilities, impairing any vested right, or creating any new obligation, duty, or disability. As explained above, the CDSOA did not substantively change the antidumping law.

Even in *Landgraf*, the Supreme Court recognized that a statute "is not made retroactive merely because it draws upon antecedent facts for its operation." *Landgraf,* 511 U.S. at 270 n.24, quoting *Cox* v. *Hart,* 260 U.S. 427, 435 (1922).

Whether a new statute has a "significant connection with past events" "'depends upon whether the conduct that allegedly triggers the statute's application occurred before or after the law's effective date.'" *Travenol Labs., Inc. v. United States,* 118 F.3d 749, 752 (Fed. Cir. 1997), quoting *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 16 (1st Cir. 1993). Schaeffler says that the CDSOA has a significant connection to a past event because there is a "direct connection between the CDSOA's petition support requirement and Schaeffler's past opposition to the AFB petition." Schaeffler Brief at 18. But, here, Schaeffler's pre-enactment opposition to the petition did not trigger application of the CDSOA. Nor did the existence of the pre-enactment antifriction bearings orders themselves trigger application of the CDSOA. Rather, application of the statute to Schaeffler was triggered when it filed, post-enactment, its requests for CDSOA distributions for a particular fiscal year.

The CDSOA only applied to duties assessed on or after October 1, 2000. *See* 19 U.S.C. § 1675c (note). The CDSOA's petition-support requirement only determined Schaeffler's status for purposes of its eligibility for distributions of duties assessed after CDSOA enactment. Thus, under a *Landgraf* analysis, because the CDSOA affected only duties assessed after enactment, its primary effect was prospective, not retroactive.

Even if Schaeffler was correct in this assertion, however, it would be of no moment. The relevant question presented here is not whether the CDSOA has "retroactive effects" but whether the statute's clearly stated temporal reach is *constitutionally permissible* because it is supported by a legitimate legislative purpose. Schaeffler's reliance on the *Landgraf* analysis is thus wholly misplaced because that case does not address the relevant question.

The CDSOA expressly applies to all orders "in effect on January 1, 1999." 19 U.S.C. § 1675c(d)(1). Given this clear instruction as to the CDSOA's temporal reach, there is no basis for a *Landgraf* analysis of the statute. *See Landgraf,* 511 U.S. at 280 (if Congress's temporal reach instructions are clear, "there is no need to resort to judicial default rules"); *see also Madrid v. Gomez*, 940 F. Supp. 247, 249 (N.D. Cal. 1996) ("[C]ourts must first determine 'whether Congress has expressly prescribed the statute's proper reach.' *Landgraf,* 511 U.S. at [280], 114 S.Ct. at 1505. If so, that ends the matter and we follow Congressional command (assuming such command does not itself violate the Constitution).").

---

As for considerations of fair notice, reasonable reliance, and settled expectations, those *Landgraf* factors are not pertinent because Schaeffler has failed to identify a protected interest. *See supra.* Moreover, even if Schaeffler had "settled expectations" upset by the CDSOA, the case law is "'clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.'" *Pension Benefit,* 467 U.S. at 729, quoting *Turner Elkhorn,* 428 U.S. at 15-16.

50

Moreover, Schaeffler does not contest that the CDSOA's temporal-reach instructions encompass Schaeffler's pre-enactment conduct opposing the antidumping petitions, and that the statute's petition-support requirement thus makes it ineligible for distributions. Rather, Schaeffler acknowledges that it does. *See* Schaeffler Brief at 10-11 ("The CDSOA as applied to Schaeffler … [bases] its eligibility for CDSOA disbursements … on conduct (i.e., a failure to express support for the AFB petition) that occurred prior to enactment of the CDSOA."). Thus, Schaeffler does not raise the type of temporal reach issue that was resolved in *Landgraf*. Instead, Schaeffler argues that the CDSOA's temporal reach instruction (while clear) violates its constitutional due process rights because the petition-support requirement lacks a rational basis when applied to pre-enactment orders. *See* Schaeffler Brief at 11 ("the CDSOA as applied to Schaeffler is a violation of the Due Process Clause of the Fifth Amendment to the Constitution"), and 25 ("To reward pre-enactment litigation support activities would be gratuitous and unrelated to the goal of motivating compliance with governmental policy."). As shown above, however, Schaeffler's due process argument fails because the statute's retroactive reach is supported by a rational legislative purpose.

## CONCLUSION

For the foregoing reasons, the Court should reject Schaeffler's Due Process challenge.  The Court should affirm the Trade Court's decision that the retroactive application of the CDSOA's petition-support requirement is supported by a legitimate legislative purpose, and therefore does not violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

Respectfully submitted,

*/s/ Terence P. Stewart*

Terence P. Stewart
Geert De Prest
Patrick J. McDonough
STEWART AND STEWART
2100 M Street, N.W.
Washington, D.C. 20037
(202) 785-4185
tstewart@stewartlaw.com

*Special Counsel for Defendants-Appellees*
*The Timken Company and MPB Corporation*

November 3, 2014

# EXHIBIT 1

**(B) Exception**

If the administering authority determines that the interested party who requested an investigation under this section is a related party or an importer within the meaning of section 1677(4)(B) of this title, the administering authority may decline a request by such party to initiate a review of an order under section 1675(c) of this title which involves the same or comparable subject merchandise.

**(2) Cumulation**

If a review under section 1675(c) of this title is initiated under paragraph (1), such review shall be treated as having been initiated on the same day as the investigation under this section, and the Commission may, in accordance with section 1677(7)(G) of this title, cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which such investigations are treated as initiated on the same day.

**(3) Time and procedure for Commission determination**

The Commission shall render its determination in the investigation conducted under this section at the same time as the Commission's determination is made in the review under section 1675(c) of this title that is initiated pursuant to this subsection. The Commission shall in all other respects apply the procedures and standards set forth in section 1675(c) of this title to such section 1675(c) of this title reviews.

(June 17, 1930, ch. 497, title VII, §753, as added Pub. L. 103–465, title II, §271(a), Dec. 8, 1994, 108 Stat. 4918; amended Pub. L. 104–295, §39, Oct. 11, 1996, 110 Stat. 3540.)

REFERENCES IN TEXT

Section 1303 of this title, referred to in subsecs. (a)(2) and (c), is defined in section 1677(26) of this title to mean section 1330 as in effect on the day before Jan. 1, 1995.

AMENDMENTS

1996—Pub. L. 104–295, §39(1), inserted "or section 1671(c)" after "section 1303" in section catchline.
Subsecs. (a)(2), (c). Pub. L. 104–295 inserted "or section 1671(c) of this title" after "section 1303 of this title" and struck out "under section 1303(a)(2) of this title" after "material injury".

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

**§ 1675c. Continued dumping and subsidy offset**

**(a) In general**

Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the "continued dumping and subsidy offset".

**(b) Definitions**

As used in this section:

**(1) Affected domestic producer**

The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that—

(A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and
(B) remains in operation.

Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.

**(2) Commissioner**

The term "Commissioner" means the Commissioner of Customs.

**(3) Commission**

The term "Commission" means the United States International Trade Commission.

**(4) Qualifying expenditure**

The term "qualifying expenditure" means an expenditure incurred after the issuance of the antidumping duty finding or order or countervailing duty order in any of the following categories:

(A) Manufacturing facilities.
(B) Equipment.
(C) Research and development.
(D) Personnel training.
(E) Acquisition of technology.
(F) Health care benefits to employees paid for by the employer.
(G) Pension benefits to employees paid for by the employer.
(H) Environmental equipment, training, or technology.
(I) Acquisition of raw materials and other inputs.
(J) Working capital or other funds needed to maintain production.

**(5) Related to**

A company, business, or person shall be considered to be "related to" another company, business, or person if—

(A) the company, business, or person directly or indirectly controls or is controlled by the other company, business, or person,
(B) a third party directly or indirectly controls both companies, businesses, or persons,

(C) both companies, businesses, or persons directly or indirectly control a third party and there is reason to believe that the relationship causes the first company, business, or persons to act differently than a non-related party.

For purposes of this paragraph, a party shall be considered to directly or indirectly control another party if the party is legally or operationally in a position to exercise restraint or direction over the other party.

### (c) Distribution procedures

The Commissioner shall prescribe procedures for distribution of the continued dumping or subsidies offset required by this section. Such distribution shall be made not later than 60 days after the first day of a fiscal year from duties assessed during the preceding fiscal year.

### (d) Parties eligible for distribution of antidumping and countervailing duties assessed

#### (1) List of affected domestic producers

The Commission shall forward to the Commissioner within 60 days after the effective date of this section in the case of orders or findings in effect on January 1, 1999, or thereafter, or in any other case, within 60 days after the date an antidumping or countervailing duty order or finding is issued, a list of petitioners and persons with respect to each order and finding and a list of persons that indicate support of the petition by letter or through questionnaire response. In those cases in which a determination of injury was not required or the Commission's records do not permit an identification of those in support of a petition, the Commission shall consult with the administering authority to determine the identity of the petitioner and those domestic parties who have entered appearances during administrative reviews conducted by the administering authority under section 1675 of this title.

#### (2) Publication of list; certification

The Commissioner shall publish in the Federal Register at least 30 days before the distribution of a continued dumping and subsidy offset, a notice of intention to distribute the offset and the list of affected domestic producers potentially eligible for the distribution based on the list obtained from the Commission under paragraph (1). The Commissioner shall request a certification from each potentially eligible affected domestic producer—

(A) that the producer desires to receive a distribution;

(B) that the producer is eligible to receive the distribution as an affected domestic producer; and

(C) the qualifying expenditures incurred by the producer since the issuance of the order or finding for which distribution under this section has not previously been made.

#### (3) Distribution of funds

The Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications described in para-

graph (2). The distributions shall be made on a pro rata basis based on new and remaining qualifying expenditures.

### (e) Special accounts

#### (1) Establishments

Within 14 days after the effective date of this section, with respect to antidumping duty orders and findings and countervailing duty orders notified under subsection (d)(1) of this section, and within 14 days after the date an antidumping duty order or finding or countervailing duty order issued after the effective date takes effect, the Commissioner shall establish in the Treasury of the United States a special account with respect to each such order or finding.

#### (2) Deposits into accounts

The Commissioner shall deposit into the special accounts, all antidumping or countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section under the antidumping duty order or finding or the countervailing duty order with respect to which the account was established.

#### (3) Time and manner of distributions

Consistent with the requirements of subsections (c) and (d) of this section, the Commissioner shall by regulation prescribe the time and manner in which distribution of the funds in a special account shall be made.

#### (4) Termination

A special account shall terminate after—

(A) the order or finding with respect to which the account was established has terminated;

(B) all entries relating to the order or finding are liquidated and duties assessed collected;

(C) the Commissioner has provided notice and a final opportunity to obtain distribution pursuant to subsection (c) of this section; and

(D) 90 days has elapsed from the date of the notice described in subparagraph (C).

Amounts not claimed within 90 days of the date of the notice described in subparagraph (C), shall be deposited into the general fund of the Treasury.

(June 17, 1930, ch. 497, title VII, §754, as added Pub. L. 106–387, §1(a) [title X, §1003(a)], Oct. 28, 2000, 114 Stat. 1549, 1549A–73.)

REFERENCES IN TEXT

The Antidumping Act of 1921, referred to in subsecs. (a) and (b)(1)(A), probably means the Antidumping Act, 1921, act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, §106(a), July 26, 1979, 93 Stat. 193.

For effective date of this section, referred to in subsecs. (d)(1), (e)(1), and (2), see Effective Date note set out below.

EFFECTIVE DATE

Pub. L. 106–387, §1(a) [title X, §1003(c)], Oct. 28, 2000, 114 Stat. 1549, 1549A–75, provided that: ''The amendments made by this section [enacting this section]

shall apply with respect to all antidumping and countervailing duty assessments made on or after October 1, 2000.''

### TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

### FINDINGS OF CONGRESS

Pub. L. 106–387, §1(a) [title X, §1002], Oct. 28, 2000, 114 Stat. 1549, 1549A–72, provided that: ''Congress makes the following findings:

''(1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.

''(2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.

''(3) The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.

''(4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.

''(5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.''

SUBPART B—CONSULTATIONS AND DETERMINATIONS REGARDING QUANTITATIVE RESTRICTION AGREEMENTS

### § 1676. Required consultations

#### (a) Agreements in response to countervailable subsidies

Within 90 days after the administering authority accepts a quantitative restriction agreement under section 1671c(a)(2) or (c)(3) of this title, the President shall enter into consultations with the government that is party to the agreement for purposes of—

(1) eliminating the countervailable subsidy completely, or

(2) reducing the net countervailable subsidy to a level that eliminates completely the injurious effect of exports to the United States of the merchandise.

#### (b) Modification of agreements on basis of consultations

At the direction of the President, the administering authority shall modify a quantitative restriction agreement as a result of consultations entered into under subsection (a) of this section.

#### (c) Special rule regarding agreements under section 1671c(c)(3) of this title

This chapter shall cease to apply to a quantitative restriction agreement described in section 1671c(c)(3) of this title at such time as that agreement ceases to have force and effect under section 1671c(f) of this title or violation is found under section 1671c(i) of this title.

(June 17, 1930, ch. 497, title VII, §761, as added Pub. L. 98–573, title VI, §611(a)(4), Oct. 30, 1984, 98 Stat. 3031; amended Pub. L. 103–465, title II, §270(a)(1)(I), (b)(1)(C), (2), Dec. 8, 1994, 108 Stat. 4917.)

### AMENDMENTS

1994—Subsec. (a). Pub. L. 103–465, §270(b)(1)(C), (2), inserted ''countervailable'' before ''subsidies'' in heading. Subsec. (a)(1), (2). Pub. L. 103–465, §270(a)(1)(I), inserted ''countervailable'' before ''subsidy''.

### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

### EFFECTIVE DATE

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

### § 1676a. Required determinations

#### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—

(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any countervailable subsidy is being provided with respect to the subject merchandise and, if being so provided, the net countervailable subsidy; and

(2) if the administering authority initiates a proceeding under paragraph (1), the Commission shall determine whether imports of the merchandise of the kind subject to the agreement will, upon termination of the agreement, materially injure, or threaten with material injury, an industry in the United States or materially retard the establishment of such an industry.

#### (b) Determinations

The determinations required to be made by the administering authority and the Commission under subsection (a) of this section shall be made under such procedures as the administering authority and the Commission, respectively, shall by regulation prescribe, and shall be treated as final determinations made under section 1671d of this title for purposes of judicial review under section 1516a of this title. If the determinations by each are affirmative, the administering authority shall—

(1) issue a countervailing duty order under section 1671e of this title effective with respect

shall be treated as having been initiated on the same day as the investigation under this section, and the Commission may, in accordance with section 1677(7)(G) of this title, cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which such investigations are treated as initiated on the same day.

**(3) Time and procedure for Commission determination**

The Commission shall render its determination in the investigation conducted under this section at the same time as the Commission's determination is made in the review under section 1675(c) of this title that is initiated pursuant to this subsection. The Commission shall in all other respects apply the procedures and standards set forth in section 1675(c) of this title to such section 1675(c) of this title reviews.

(June 17, 1930, ch. 497, title VII, § 753, as added Pub. L. 103–465, title II, § 271(a), Dec. 8, 1994, 108 Stat. 4918; amended Pub. L. 104–295, § 39, Oct. 11, 1996, 110 Stat. 3540.)

REFERENCES IN TEXT

Section 1303 of this title, referred to in subsecs. (a)(2) and (c), is defined in section 1677(26) of this title to mean section 1330 as in effect on the day before Jan. 1, 1995.

AMENDMENTS

1996—Pub. L. 104–295, § 39(1), inserted "or section 1671(c)" after "section 1303" in section catchline.

Subsecs. (a)(2), (c). Pub. L. 104–295 inserted "or section 1671(c) of this title" after "section 1303 of this title" and struck out "under section 1303(a)(2) of this title" after "material injury".

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

## § 1675c. Repealed. Pub. L. 109–171, title VII, § 7601(a), Feb. 8, 2006, 120 Stat. 154

Section 1675c, act June 17, 1930, ch. 497, title VII, § 754, as added Pub. L. 106–387, § 1(a) [title X, § 1003(a)], Oct. 28, 2000, 114 Stat. 1549, 1549A–73, related to the continued dumping and subsidy offset.

EFFECTIVE DATE OF REPEAL

Pub. L. 109–171, title VII, § 7601(b), Feb. 8, 2006, 120 Stat. 154, provided that the repeal made by section 7601(a) is effective Feb. 8, 2006.

PROHIBITION ON COLLECTION OF CERTAIN PAYMENTS MADE UNDER THE CONTINUED DUMPING AND SUBSIDY OFFSET ACT OF 2000.

Pub. L. 111–5, div. B, title I, § 1701, Feb. 17, 2009, 123 Stat. 366, provided that:

"(a) IN GENERAL.—Notwithstanding any other provision of law, neither the Secretary of Homeland Security nor any other person may—

"(1) require repayment of, or attempt in any other way to recoup, any payments described in subsection (b); or

"(2) offset any past, current, or future distributions of antidumping or countervailing duties assessed with respect to imports from countries that are not parties to the North American Free Trade Agreement in an attempt to recoup any payments described in subsection (b).

"(b) PAYMENTS DESCRIBED.—Payments described in this subsection are payments of antidumping or countervailing duties made pursuant to the Continued Dumping and Subsidy Offset Act of 2000 (section 754 of the Tariff Act of 1930 (19 U.S.C. 1675c; repealed by subtitle F of title VII of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154))) that were—

"(1) assessed and paid on imports of goods from countries that are parties to the North American Free Trade Agreement; and

"(2) distributed on or after January 1, 2001, and before January 1, 2006.

"(c) PAYMENT OF FUNDS COLLECTED OR WITHHELD.—Not later than the date that is 60 days after the date of the enactment of this Act [Feb. 17, 2009], the Secretary of Homeland Security shall—

"(1) refund any repayments, or any other recoupment, of payments described in subsection (b); and

"(2) fully distribute any antidumping or countervailing duties that the U.S. Customs and Border Protection is withholding as an offset as described in subsection (a)(2).

"(d) LIMITATION.—Nothing in this section shall be construed to prevent the Secretary of Homeland Security, or any other person, from requiring repayment of, or attempting to otherwise recoup, any payments described in subsection (b) as a result of—

"(1) a finding of false statements or other misconduct by a recipient of such a payment; or

"(2) the reliquidation of an entry with respect to which such a payment was made."

DISTRIBUTIONS ON CERTAIN ENTRIES

Pub. L. 111–291, title VIII, § 822, Dec. 8, 2010, 124 Stat. 3163, as amended by Pub. L. 111–312, title V, § 504(a), Dec. 17, 2010, 124 Stat. 3308, provided that: "Notwithstanding section 1701(b) [probably means 7601(b)] of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154 (19 U.S.C. 1675c note) [set out below]) or any other provision of law, no payments shall be distributed under section 754 of the Tariff Act of 1930 [this section], as in effect on the day before the date of the enactment of such section 1701 [probably means 7601, which was approved Feb. 8, 2006], with respect to the entries of any goods that are, on the date of the enactment of this Act [Dec. 8, 2010]—

"(1) unliquidated; and

"(2)(A) not in litigation; and

"(B) not under an order of liquidation from the Department of Commerce."

[Pub. L. 111–312, title V, § 504(b), Dec. 17, 2010, 124 Stat. 3308, provided that: "The amendment made by subsection (a) [amending section 822 of Pub. L. 111–291, set out above] shall take effect as if included in the provisions of the Claims Resolution Act of 2010 [Pub. L. 111–291]."]

Pub. L. 109–171, title VII, § 7601(b), Feb. 8, 2006, 120 Stat. 154, provided that: "All duties on entries of goods made and filed before October 1, 2007, that would, but for subsection (a) of this section [repealing this section], be distributed under section 754 of the Tariff Act of 1930 [this section], shall be distributed as if section 754 of the Tariff Act of 1930 had not been repealed by subsection (a)."

SUBPART B—CONSULTATIONS AND DETERMINATIONS REGARDING QUANTITATIVE RESTRICTION AGREEMENTS

## § 1676. Required consultations

### (a) Agreements in response to countervailable subsidies

Within 90 days after the administering authority accepts a quantitative restriction agreement under section 1671c(a)(2) or (c)(3) of this title, the President shall enter into consultations with the government that is party to the agreement for purposes of—

(1) eliminating the countervailable subsidy completely, or

(2) reducing the net countervailable subsidy to a level that eliminates completely the injurious effect of exports to the United States of the merchandise.

### (b) Modification of agreements on basis of consultations

At the direction of the President, the administering authority shall modify a quantitative restriction agreement as a result of consultations entered into under subsection (a) of this section.

### (c) Special rule regarding agreements under section 1671c(c)(3) of this title

This chapter shall cease to apply to a quantitative restriction agreement described in section 1671c(c)(3) of this title at such time as that agreement ceases to have force and effect under section 1671c(f) of this title or violation is found under section 1671c(i) of this title.

(June 17, 1930, ch. 497, title VII, § 761, as added Pub. L. 98–573, title VI, § 611(a)(4), Oct. 30, 1984, 98 Stat. 3031; amended Pub. L. 103–465, title II, § 270(a)(1)(I), (b)(1)(C), (2), Dec. 8, 1994, 108 Stat. 4917.)

AMENDMENTS

1994—Subsec. (a). Pub. L. 103–465, § 270(b)(1)(C), (2), inserted "countervailable" before "subsidies" in heading.

Subsec. (a)(1), (2). Pub. L. 103–465, § 270(a)(1)(I), inserted "countervailable" before "subsidy".

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE

Section applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as an Effective Date of 1984 Amendment note under section 1671 of this title.

## § 1676a. Required determinations

### (a) In general

Before the expiration date, if any, of a quantitative restriction agreement accepted under section 1671c(a)(2) or 1671c(c)(3) of this title (if suspension of the related investigation is still in effect)—

(1) the administering authority shall, at the direction of the President, initiate a proceeding to determine whether any countervailable subsidy is being provided with respect to the subject merchandise and, if being so provided, the net countervailable subsidy; and

(2) if the administering authority initiates a proceeding under paragraph (1), the Commission shall determine whether imports of the merchandise of the kind subject to the agreement will, upon termination of the agreement, materially injure, or threaten with material injury, an industry in the United States or materially retard the establishment of such an industry.

### (b) Determinations

The determinations required to be made by the administering authority and the Commission under subsection (a) of this section shall be made under such procedures as the administering authority and the Commission, respectively, shall by regulation prescribe, and shall be treated as final determinations made under section 1671d of this title for purposes of judicial review under section 1516a of this title. If the determinations by each are affirmative, the administering authority shall—

(1) issue a countervailing duty order under section 1671e of this title effective with respect to merchandise entered on and after the date on which the agreement terminates; and

(2) order the suspension of liquidation of all entries of subject merchandise which are entered, or withdrawn from warehouse for consumption, on or after the date of publication of the order in the Federal Register.

### (c) Hearings

The determination proceedings required to be prescribed under subsection (b) of this section shall provide that the administering authority and the Commission must, upon the request of any interested party, hold a hearing in accordance with section 1677c of this title on the issues involved.

(June 17, 1930, ch. 497, title VII, § 762, as added Pub. L. 98–573, title VI, § 611(a)(4), Oct. 30, 1984, 98 Stat. 3032; amended Pub. L. 103–465, title II, §§ 233(a)(5)(Z), (AA), 270(a)(1)(J), Dec. 8, 1994, 108 Stat. 4900, 4917.)

AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465, §§ 233(a)(5)(Z), 270(a)(1)(J), inserted "countervailable" before "subsidy" in two places and substituted "subject merchandise" for "merchandise subject to the agreement".

Subsec. (b)(2). Pub. L. 103–465, § 233(a)(5)(AA), substituted "subject merchandise" for "merchandise subject to the order".

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on

by:

November 3, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Terence P. Stewart

/s/ Terence P. Stewart

Name of Counsel

Signature of Counsel

Law Firm  Stewart and Stewart

Address  2100 M Street, NW

City, State, ZIP  Washington, DC 20037

Telephone Number  (202) 785-4185

FAX Number  (202) 466-1286

E-mail Address  tstewart@stewartlaw.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

**FORM 19.**     **Certificate of Compliance With Rule 32(a)**

---

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒   The brief contains      [ 12,208 ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐   The brief uses a monospaced typeface and contains [*state the number*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or FRAP 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒   The brief has been prepared in a proportionally spaced typeface using [ ***Microsoft Word*** ]      in    [ ***Times New Roman, 14 point font*** ], or exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐   The brief has been prepared in a monospaced typeface using [ *state name and version of word processing program* ] with [ *state number of characters per inch and name of type style* ].

*/s/ **Terence P. Stewart***
_____
(Signature of Attorney)

**Terence P. Stewart**
_____
(Name of Attorney)

**Counsel for The Timken Company and MPB Corporation, Defendants-Appellees**
_____
(State whether representing appellant, appellee, etc.)

**November 3, 2014**
_____
(Date)